MilligAN, J.,
delivered the opinion of the court:
This is a claim for an unpaid balance of $3,856 89, alleged to be due the claimants on account of the wages of the ship Do Witt Clinton.
The vessel was chartered to the United States on the 10th day of January, 1863, for a period of three months from the date of the charter-party, with the privilege of retaining her as much longer as her services may be required.
By the charter-party the “ship was to be used as a transport for a United States battery of artillery, with the horses and stores which may belong thereto, with the privilege of sending her to any ports or places where the depth of the water will permit.”
Added to this stipulation, the United States were to furnish sufficient cargo or ballast, and to have the whole and exclusive use of the said vessel, except the necessary room for the accommodation of the crew, &c. The claimants were to prepare the ship for the reception of the troops and horses of the battery, and to keep everything in order necessary for the comfort and convenience of the men and animals while on the voyage.
It is further agreed, that, in consideration of this charter, the United States were to pay the claimants at the rates of $3 50 per registered ton for each calendar mouth for the time the vessel may be kept in service, payable monthly, and when her services shall be no longer required she may be discharged at such port as the United States may elect, in the same condition that she then was, ordinary wear and tear, damages by the elements, or collisions at sea, only excepted. ■ “Thetime” of the vessel’s service, as stipulated in the charter-party, was “to. cease from the time of notice to the master on board.” .
The burden of the ship, as agreed upon in the charter, was 1,066|| tons. She was commanded by Captain Mosher, and *267 went into the service of tbe government at the date of her cbarter-party, and arrived witb ber cargo at New Orleans on the 13th of May, 1863. After reporting to tbe quartermaster she discharged her cargo, and remained in the harbor until the 11th of June, 1863, when the acting quartermaster, A. H. Shipley, indorsed on the charter-party, “The ship De Witt Clinton was discharged from service on the evening of the 16th day of May, 1863.”
This order, declaring the discharge of the vessel, was made by its terms to operate anterior to the time it was actually entered on the charter-party. The master of the vessel at the time protested against it, and called the attention of the quartermaster to the provision in the charter requiring the United States to ballast the vessel before her discharge, and that he had received no previous orders from him since his arrival at New Orleans. The quartermaster admitted the obligation of the United States to ballast the vessel, and ordered it to be done, but refused, after having written the order for the ship’s discharge, to change it.
There is a conflict of testimony in relation to the fact whether or not the captain of the ship reported to the quartermaster for orders after his arrival at New Orleans and the discharge of the ship’s cargo. The quartermaster, Captain Shipley, testifies that “It is my impression, the next day after I ordered her cargo to be discharged, the 14th of May, 1863, the captain of the ship asked me what I intended to do with his ship when her cargo was out. I remarked to him that probably I would load him with cotton, and ordered him to report to me as soon as-she was unloaded; but he never did report himself to me until about the 11th of June, 1863, although I sent nearly every day for him.”
But this testimony is flatly contradicted by the direct testimony of Charles H. Hamlin and Mark Prime, who are substantially corroborated by Augustus Dane.
Hamlin swears, from the 18th of May, 1863, when the vessel was fully discharged of her cargo, to the 4th of June following, uhe went with Captain Mosher, master of the DeWitt Clinton, to the office of Captain Shipley, United States quartermaster, five times that he remembers, and he thinks more, at each of which times he heard him report to Captain Shipley and ask for orders. Captain Mosher was respectful and polite in his- *268 demeanor to Captain Shipley. Captain Shipley never gave him any orders in reply to his inquiries, but usually told him that he was busy and could not attend to him, and told him to call again.”
The witness Prime states he often heard Captain Mosher apply to Captain Shipley for orders for the vessel, and the answer was invariably, “ that he could not yet tell until about the middle of June.”
These two witnesses are unimpeached, and appear to be intelligent, and are both substantially corroborated by Augustus Dane.
On these specific facts, with others which appear in the record, and which might be set out specifically in this opinion, we find that Captain Mosher did, on his arrival at New Orleans, on the 13th of May, 1863, promptly report to the quartermaster at that station, and repeatedly, after the vessel’s cargo was discharged, report to Captain Shipley and ask for orders, which were not given, and he required to return again and again, until the 11th of June, 1863, when his vessel was discharged by the quartermaster, as of the 16th of May previous.
The ship appears to have been ballasted by order of Captain Shipley on the 18th of June, two days after the day on which her discharge was indorsed on the charter-party.
The last payment of her wages is shown to have been made up to and including the 16th of May, 1863, at Boston, on the 27th of August, 1864, and a receipt in full of the account as made out, given by Mr. Sears, managing owner of-the ship.
At the date of this payment Mr. Sears claimed compensation up to the real date of the discharge of his vessel, viz, the 16th or 18th of June, 1863; but Captain McKim, who paid the account, told him he could only pay to the 16th of May, but such payment would not prejudice his claim for the bal-anee.
The claimant subsequently applied for redress to the Quartermaster G-eneral’s office, which, as General Meigs, on the 3d of July, 1869, states, “ has been repeatedly disallowed by the Quartermaster General for the reasons that the claimants have been paid all that they are justly entitled to by the government for services of the Clinton.”
Under these facts and circumstances this' action is now *269 brought for the wages of the ship, under the charter-party, from May 16 to June 18, 1863.
The case is a plain one, and appears to have been rejected by the Quartermaster General on a mistaken notion of the real facts now developed in it. He says in his report, before referred to, that “ after the vessel was discharged of cargo the captain did not report to the office of the quartermaster’s department. in charge of transportation for further orders, as he should have done, (although repeatedly sent for,) until June 12,1863. On this supposed state of facts it is apparent the Quartermaster General was led to reject the claim. What would have been his action had the facts now disclosed in this record been before him we need not stop to conjecture; nor need we now enter into a critical investigation of the etiquette due from the master of a vessel to an assistant quartermaster in charge of a harbor to which the vessel is consigned. The case rests on no such unsubstantial grounds. The quartermaster had no legal authority to antedate the effect of his order discharging the vessel without the assent of the master or owner. He iras bound to know his duty under the charter-party of the vessel consigned to him, and when the master first reported at his office, on his arrival in the harbor, he should, if he did not already know, have informed himself of the provisions of the charter under which the vessel sailed.
•The quartermaster’s endorsement on the charter party has not the verity of a record that it may not be impeached and overthrown by countervailing parol testimony.
The effect attempted to be given to the order discharging the vessel anterior to its true date is a palpable violation of the provisions of the charter-party, which, declare that the time of the vessel’s service shall cease from the time of notice to the master on board. There is no pretense that any such notice was given until the time — the 11th of June, 1863 — the order discharging the vessel was actually written on the charter-party ; and then the retrospective operation of the order was protested against by the master of the ship. Moreover, the reasons assigned by Captain Shipley for thus antedating the effect of his order are met and flatly contradicted by the claimants’ countervailing testimony; so that the order stands unsupported either in law or fact. It is utterly without excuse, and cannot be held to have operated as a discharge of the *270 vessel until tbe day of its entry on tbe charter-party, wben tbe master on board first bad notice of it.
No blame attaches to tbe master of tbe sbip. He could not bave acted otherwise, if be would. He was held under orders from day to day, without authority to sail or power to obtain orders, except through the quartermaster, to whom he frequently applied for orders while lying- in the harbor, without success.
More than this, the vessel, as is substantially admitted by the quartermaster, was not ballasted and put in the condition required by the charter in which she could be discharged, until the 18th of June, 1863.
On the whole case, the right of the claimants to recover is fully made out; and we find, from a careful examination of the amount the vessel has been paid, that there still remains due her the sum of $3,856 89, for which judgment will be entered.